UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

HAAC CHILE, S.A.,

    **Plaintiff,**

v.          **606CV086**

BLAND FARMS, LLC and
DELBERT BLAND,

    **Defendants.**

## ORDER

## I. INTRODUCTION

Plaintiff HAAC Chile, S.A. (HAAC) brings this PACA[1]/breach of contract case against defendants Bland Farms, LLC (Bland Farms) and Delbert Bland (Bland), collectively "the Blands." Doc. # 1. In 5/04, HAAC, a Chilean corporation, entered into a joint venture with the Blands, located in Glennville, Georgia, under which HAAC would produce sweet onions in Chile and ship them to the U.S. for the Blands to sell. Doc. # 1 at 1-2.

HAAC alleges that the Blands, upon receiving the onion shipment, delayed selling them, resulting in lost sales of produce. *Id.* at 2. This delay violated an implied contractual duty incorporated into the contract by the PACA. *Id.* Furthermore, HAAC questions the validity of the Blands' accounting and payment practices under PACA requirements. *Id.* at 3.

The Blands denied liability and counterclaimed, insisting that HAAC breached their contract because: (1) the onion quantity shipped was "greatly smaller" than the contractually-contemplated amount; (2) the quality of produce shipped was very poor; (3) HAAC failed to pay certain freight costs; and (4) HAAC failed to document and verify claimed expenses. Doc. # 7. In fact, the Blands contend that "a full and complete accounting of the expenses incurred by the parties will ... indicate that [HAAC] owes Defendant Bland money...." *Id.* at 4.

Both sides have filed motions: (1) the Blands question the subject matter jurisdiction of this Court, doc. # 26; (2) both parties move to exclude each other's expert witnesses, doc. ## 27, 31; and (3) HAAC seeks partial summary judgment on the Blands' counterclaim, doc. # 33.[2]

---

[1] Perishable Agricultural Commodities Act of 1930 (PACA), 7 U.S.C. § 499a, *et seq.* As one encyclopedist explains:

> The [PACA] is designed to protect sellers from the wrongful rejection of agricultural produce by buyers. It is primarily intended to provide a practical remedy to small farmers and growers who are vulnerable to sharp practices of financially irresponsible and unscrupulous brokers in perishable commodities. It was passed principally to eliminate unfair practices in the marketing of perishable agricultural commodities in interstate commerce in the case of a declining market, by making it difficult for unscrupulous persons to take advantage of shippers, by wrongfully rejecting goods on arrival, at the point where it is expensive and impracticable for the shipper to enforce his or her legal rights.

18 Williston on Contracts § 52:17 (4th ed. May 2008).

---

[2] Bland Farms claims that it is not a party to the contract and should be dismissed entirely from this case. Doc. # 7 at 1. The agreement identifies Delbert Bland, d/b/a ("doing business as") Bland Farms, as a party to the contract. Doc. # 1, exh. A. The contract does not say "Bland Farms, LLC" specifically, but "Bland Farms" is close enough to create a fact issue. Also, the contract is signed by "Michael Hively, General Manager" who is identified on Bland Farms's website as the CFO/General Manager of the company -- further indicating that Bland

## II. **BACKGROUND**

The parties' 5/5/04, joint-venture agreement details their respective responsibilities. Doc. # 1 at 6-8. HAAC would produce approximately 27 hectares[3] of sweet onions and then ship them during a 45 day window (12/15/04-1/30/05) to the Blands. *Id.* at 6. The parties also agreed to be accountable for certain expenses, including, *inter alia*: (1) Blands' consent to pay HAAC for its growing expenses; and (2) HAAC's agreement to pay certain freight costs. *Id.* at 7.

While HAAC was the grower, the Blands were fully in charge of sales, possessing

> the full right and authority to use its best judgment in marketing, distributing, and selling Sweet Chile Onions subject to the market condition and quality and grade of available produce....

*Id.* at 6. The Blands also were required to maintain records of all of its sales and all costs associated with the shipments. *Id.* at 7-8.

In the end, the parties agreed upon a final liquidation payment that Bland would make to "Sapei, S.A.-Valencia,-Spain" on behalf of HAAC. *Id.* at 8. That payment is "equal to 50% of the Gross Profit on everything invoiced." *Id.* Gross Profit is then defined as

> the difference between the total invoice

less freight and handling charges for delivery to ***BLAND's*** customer less any previously paid amount to ***SAPEI, S.A.-VALENCIA,-SPAIN,*** on behalf of ***HAAC CHILE, S.A.,*** by ***BLAND*** and any and all costs related to claims, credits, price adjustments.

*Id.* In other words, the Blands would make all of their sales, then deduct incurred expenses and previous payments to HAAC to arrive at Gross Profit. The Gross Profit would then be split 50%-50%.

Here, the final liquidation payment given to HAAC was less than $3,000 -- an amount apparently below HAAC's expectations (though HAAC never identifies what it did expect). *Id.* at 3. HAAC also discovered a delay between shipment-receipt and sale of product resulting in "losses on sales of product" -- implying the delay caused some onions to deteriorate and become unmarketable. *Id.* at 2. HAAC alleges that the delay violated the Blands' contractual and PACA duties. *Id.* It further challenges the validity of both the Blands' accounting practices and various charges included in calculating the final liquidation payment. *Id.* at 3.

The Blands concede that there was a delay but deny it was inappropriate. They attribute that delay and lost sales to the poor condition and quality of the onions shipped:

> [HAAC's] product was of such bad quality and such poor condition that in Defendants' best judgment it was necessary to unpack, dry, re-grade and re-pack the product before it could be sold or delivered.

Doc. # 7 at 3. Thus they deny any breach on their part, and allege that HAAC actually

---

Farms, LLC was a party to this contract. *Id.*; *see also* http://www.blandfarms.com/contact.asp. But this matter has not been fully briefed by the parties. Thus, the Court will reserve ruling until it receives a proper, fully-briefed motion from Bland Farms and a HAAC response brief.

[3] A hectare equals 10,000 square meters (2.471 acres). http://www.thefreedictionary.com/hectare (site as of 8/25/08).

breached the agreement because, *inter alia*, the poor quality of the onions constituted a complete failure of consideration. *Id.* at 4. Defendants also question the validity of HAAC's claimed growing expenses and seek an accounting. *Id.*

In response, HAAC cites 19 U.S. Department of Agriculture (USDA) inspection certificates of the sweet onions, 18 of which certified them as U.S. Grade No. 1.[4] Doc. # 33 at 6. This indicates a finding of good quality. Meanwhile, the Blands produce an employee and experts

---

[4] The USDA inspects produce at the request of buyers and sellers. According to its website, "USDA quality standards are based on measurable attributes that describe the value and utility of the product." http://www.ams.usda.gov/AMSv1.0/ams.fetchTemplate Data.do?template=TemplateG&navID=FindaStandardG radingCertificationandVerification&rightNav1=FindaSt andardGradingCertificationandVerification&topNav=&l eftNav=GradingCertificationandVerfication&page=Stan dards&resultType= (site as of 8/25/08).

The USDA further explains:

> In these commodities, the grading service is used by wholesalers, and the final retail packaging may not include the grade mark. However, quality grades are widely used--even if they are not prominently displayed--as a "language" among traders. They make business transactions easier whether they are local or made over long distances. Consumers, as well as those involved in the marketing of agricultural products, benefit from the greater efficiency permitted by the availability and application of grade standards.

http://www.ams.usda.gov/AMSv1.0/ams.fetchTemplate Data.do?template=TemplateN&navID=GradingServices linkStandards&rightNav1=GradingServiceslinkStandard s&topNav=&leftNav=GradingCertificationandVerficati on&page=Grading&resultType=&acct=AMSPW (site as of 8/25/08).

who will testify that the onions were in poor condition and diseased. Doc. ## 43, 44. HAAC believes this evidence is not relevant or admissible here. These disagreements drive many of the issues that follow.

## III. ANALYSIS

### A. Subject Matter Jurisdiction

HAAC invokes this Court's federal question jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"). Doc. # 1 at 1. "Federal question jurisdiction may be based on a civil action alleging a violation of the United States Constitution or a federal cause of action established by a Congressionally-created expressed or implied private remedy for violations of a federal statute." *City of Huntsville v. City of Madison*, 24 F.3d 169, 171-72 (11th Cir. 1994) (cites omitted).

Here HAAC claims a violation of federal statutory law -- specifically, 7 U.S.C. § 499b(4) of the PACA.[5] That section provides:

> It shall be unlawful in or in connection with any transaction in interstate or foreign commerce: ... (4) For any commission merchant, dealer, or broker ... to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such

---

[5] HAAC's complaint actually lists 7 U.S.C. § 499e(c)(4) (statutory trust violations under the PACA) as providing jurisdiction. This was clearly a typo by HAAC, as Count II alleges improper accounting and payment under the PACA -- matters addressed by § 499b(4). HAAC's subsequent filings also clarify that it alleges a violation of § 499b(4), not § 499e(c)(4). *See* doc. # 28 at 2-4; doc. # 42-2 at 4.

commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction....

*Id.* HAAC's private remedy for a violation of § 499b(4) is found in § 499e(a) and (b):

(a) Amount of damages

If any commission merchant, dealer, or broker violates any provision of *section 499b* of this title he shall be liable to the person or persons injured thereby for the full amount of damages ... sustained in consequence of such violation.

(b) Remedies

Such liability may be enforced either (1) by complaint to the Secretary as hereinafter provided, or (2) *by suit in any court of competent jurisdiction....*

7 U.S.C. § 499e(a) and (b) (emphasis added).

Based on the private remedy available in § 499e(a) and (b), this Court has original subject matter jurisdiction over this case. Additionally, the Court will exercise supplemental jurisdiction over the state law breach of contract claim under 28 U.S.C. § 1367(a) because that claim arises out of the same case or controversy as the PACA claim. *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...."); *see also Eastside Food Plaza, Inc. v. "R" Best Produce,*

*Inc.*, 2003 WL 21727788 at * 2-3 (S.D.N.Y. 7/23/03) (exercising federal question jurisdiction over PACA § 499b(4) claims and supplemental jurisdiction over state law breach of contract claims).

**B. Choice of Law**

The Blands argue that the contract's choice-of-law provision negates application of federal law here. Doc. ## 26, 36. The contract states: "This agreement shall be construed in accordance with the substantive law of the state of Georgia." Doc. # 1, exh. A. The defendants interpret this provision to mean that Georgia contract law *alone* governs their relationship with HAAC. Doc. # 36 at 4. In that same vein, the Blands argue, the contract provides the only means of recovery (*i.e.*, HAAC cannot bring a federal statutory claim). The Court finds such an expansive reading of a boilerplate choice-of-law provision less than convincing.

To start, the Blands cite no legal authority to support their position. Next, *Atkinson v. General Elec. Credit Corp.*, 866 F.2d 396 (11th Cir. 1989), precludes their argument. It held that a similar choice-of-law provision did not prevent the application of federal law to a contract. *Id.* at 398-399 ("[P]roviding that a contract is to be governed by state law does not signify the inapplicability of federal law, for a fundamental principle in our system of complex national polity mandates that the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution") (quotes and cite omitted). In *Atkinson*, "the parties' choice of Georgia law to provide the rules of contract construction did not automatically bar the application of federal law," 866 F.2d at 399, and neither does the similar provision in this case.

Furthermore, a different contract provision here contemplates the application of the PACA to the parties' contractual relationship: "[T]his contract shall work under the rules of the P.A.C.A. ... with regards to established trading practices." Doc. # 1 at 8. This negates any intent to waive federal law.

Accordingly, the contract's standard choice-of-law provision -- the only evidence of waiver presented -- does not bar the federal claims presented here. While the Court agrees that federal statutory rights can be waived, a more specific waiver is required. *See e.g., U.S. v. Bushert*, 997 F.2d 1343, 1351 n. 20 (11th Cir. 1993) ("[T]he waiver of a [federal] right-whether constitutional or statutory-must be knowingly and voluntarily made"). Based on the evidence presented, the Court cannot say that HAAC waived application of the PACA to this relationship. Nor will the Court, given the statute's protective nature, allow the Blands to skirt congressionally-imposed requirements so easily. *See supra* n. 1.[6] Thus their motion to dismiss for lack of subject matter jurisdiction (*i.e.*, because federal law does not apply, this Court lacks jurisdiction) is denied.

## C. Experts

HAAC offers a PACA specialist, Tom Leming, as an expert in this case. The Blands object to his testimony's admissibility as an unqualified expert witness with irrelevant opinions. Doc. # 27. Meanwhile, HAAC challenges the Blands' proffered experts, Reid

Torrance and Alfredo Cornejo Delgado, as providing unreliable and irrelevant testimony. Doc. # 31.

F.R.Ev. 702 governs the admissibility of expert witness testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny guide courts in "gatekeeping" evidence under Rule 702. Under that rule,

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;[7] and (3) the testimony assists the trier of fact, through

---

[6] The Blands present no argument that certain PACA provisions were waived by virtue of conflicting contract provisions. *See e.g., American Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33, 47 (2d Cir. 2004) (where seller agreed to longer period of payment than that required by certain PACA provision, seller forfeited right to that particular PACA protection).

[7] The non-exhaustive *Daubert* factors include: (1) whether the expert's theory or technique can be, or has been, tested; (2) whether the theory or technique been subject to peer review and publication; (3) the known or potential rate of error of the technique plus the existence and maintenance of standards controlling its operation; and (4) the technique or theory's acceptance by other expert's in that field. 509 U.S. at 593-94.

the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

As gatekeepers, district courts "must ensure that any and all [expert] testimony or evidence submitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. But the *Daubert* Court emphasized that a Rule 702 inquiry is "a flexible one" and its factors are non-exhaustive. *Id.* at 593-94. Thus a trial judge focuses on the reliability and relevance of expert testimony, using the *Daubert* factors and other appropriate considerations as a guide. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

### 1. *HAAC's Expert*

Tom Leming, HAAC's expert, worked at the USDA's PACA branch for nearly thirty years. Doc. # 27 at 6. His expertise stems from investigating and auditing records (like those of the Blands) for compliance with the PACA. *Id.* at 7. He was promoted several times into various supervisor roles including Senior Marketing Specialist, PACA Northeast Regional Director, and Assistant Head, then Head, of the PACA Dispute Resolution Section's Washington, D.C. office. *Id.* In all of these positions he trained and supervised audit-investigators and ensured PACA investigation procedures were followed. *Id.*

Leming's vast experience and training certainly qualify him as a PACA legal expert in some respects. But the Blands argue he is not a lawyer and thus cannot be a legal expert. Doc. # 27 at 1. Still, they cite no authority for the proposition that one must be a lawyer to give an

expert opinion on a federal regulatory statute. With thirty years of experience and training in the area of PACA *compliance*, Leming is an expert (despite not being a lawyer) at *that* (*e.g.*, what sorts of past shipments have been found to be in PACA compliance).

The Blands also object because Leming's testimony amounts to legal conclusions -- thus invading the province of judge and jury. *Id.* at 3. That argument has teeth. Leming's "Expert Witness Statement" (doc. # 27 at 9-10) offers two testimony topics: (1) the Blands' delay in selling the onions upon receipt; and (2) a damages calculation using PACA regulations. *Id.*

As to the first topic, Leming reviewed Blands' records to determine the time elapsed between receipt and sale of the onions by Bland. *Id.* at 9. The elapsed time varied from container to container of onions. *Id.* He then calculated an average delay of 28 days between receipt and sale. *Id.* The Court doubts reading these records and calculating the time elapsed between receipt and sale requires specialized knowledge as required by F.R.Ev. 702. However, the Court does not have the records before it and thus cannot say for sure whether it takes specialized knowledge to read them. Thus if HAAC wants to pay expert witness fees to have Leming testify about the calculated delays, it may do so, for at worst such constitutes overkill, not witness incompetency.

Yet, Leming proceeds to recite a PACA provision and then offer the conclusion that "sales made an average of 28 days after arrival cannot be considered to meet the PACA requirement of prompt disposition of the onions in question." *Id.* at 10. This is a legal conclusion and *not* admissible under Rule 702. *See Cooper v. Pacific Life Ins. Co.*, 2007 WL

430730 (S.D.Ga. 2/6/07) (unpublished) ("[O]therwise admissible expert testimony may be excluded if it constitutes a legal conclusion or otherwise tells the jury what conclusion to reach, as this in no way assists the trier of fact") (citing *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); quotes omitted).

Furthermore, HAAC may not use Leming to discuss PACA regulations and essentially tell the jury what the law is in this area. *See U.S. v. Oliveros,* 275 F.3d 1299, 1306-07 (11th Cir. 2001) ("Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact"); 31A AM.JUR.2D *Expert and Opinion Evidence* § 117 (2008) ("[E]xpert testimony proffered solely to establish the meaning of a law is presumptively improper. Thus, an expert or nonexpert opinion that amounts to a conclusion of law cannot be properly received in evidence, because the determination of such questions is exclusively within the province of the court"). The Court will instruct the jury on the applicable law. Accordingly, the proper method for both parties to follow is to present legal arguments to the Court regarding the applicable law; the Court will then determine how the jury will be instructed at trial.

In the same vein, Leming's damages calculation is also inadmissible. Doc. # 27 at 10. He cites PACA regulations and a PACA administrative case to support his method of calculating damages. *Id.* These are once again legal conclusions, not specialized knowledge or expert opinion that would be helpful to the jury. *See Morales-Arcadio v. Shannon Produce Farms, Inc.*, 2007 WL 2106188 at * 12 (S.D.Ga. 7/18/07) (unpublished) (striking damages calculations of expert witness report

that simply applied statutory regulations, thus constituting legal arguments). If an expert calculates damages by merely applying statutory regulations, then those are legal arguments not expert opinion. These matters should be argued to the Court, not the jury.

Leming also offers opinions about the effect of delay and improper storage conditions on produce (that both are bad for onions). Doc. # 27 at 9. He further submits an "industry custom" opinion that typically there are only two reasons for delay in selling produce:

> (1) the seller doesn't have a market for the product at the time it was received, or (2) the seller has other product on hand in inventory ... and chooses to sell that product first, to the detriment of the grower in question.

*Id.* at 9-10.

First, the fact that onions deteriorate does not require specialized knowledge, only common sense. Second, Leming is an expert in PACA legal requirements and auditing records in this arena. Nothing in his "Professional Biography" or HAAC's arguments indicate he has any specialized knowledge of the shelf life/proper storage conditions for sweet onions, nor that he is an expert in industry custom. HAAC, as the proponent of Leming's testimony, carries the burden of proof to establish his qualifications and reliability under *Daubert*. *See McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005) ("[T]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion"). Because HAAC has not met its burden, these opinions must also be excluded.

Accordingly, the Blands' motion to exclude

Leming's testimony is granted and denied in part. Doc. # 27.

### 2. *The Blands' Experts*

HAAC challenges two of the Blands' expert opinions as unreliable based on insufficient facts and data. Doc. # 31 at 3. HAAC also objects to their testimony as irrelevant to the issues in this case. *Id.* at 9. However, there is no general objection to either witness's qualifications as an expert. Accordingly, the Court only need examine the substance of their proposed testimony.

### a. REID TORRANCE

Reid Torrance is a Georgia County Extension Agent for farmers. Doc. # 31-5 at 3 (Torrance Depo.). County Extension Agents meet with local farmers to discuss farming problems and better agricultural practices. *Id.* He first opines that he is unable to "expound on the utilization of pesticide, fertilization, and chemical applications and the characteristic of various pests and disease present" because he lacks information about pesticide/fertilizer application dates. Doc. # 31-3 at 2 (Torrance Expert Witness Statement). Of course, determining that one cannot opine about something is not an expert opinion at all. Thus it is inadmissible.

Next, Torrance addresses farming practices and botrytis neck rot[8] in HAAC's onion

shipment. Doc. # 31-3 at 2. HAAC does not object to his general knowledge about botrytis neck rot. However, HAAC does take issue with other statements.

To start, Torrance states, "Good agricultural practices are crucial to the success of sweet onion quality and volume in Chile." *Id.* While this statement must be true, nothing in Torrance's deposition evidences any expertise in Chilean onion farming. *See* doc. # 31-5. In fact, he has never even been to Chile. *Id.* at 4. Unless evidence is introduced showing that sweet onion agricultural practices in Chile are the same as those in other geographical areas where Torrance does have expertise (*e.g.*, Georgia), then he may not testify about Chilean sweet onion farming practices.

Relying on the Blands' photos of certain onions and HAAC's expense documents, Torrance also opines that "botrytis neck rot was a major problem and ... proper chemicals were not used [by HAAC]." Doc. # 31-3 at 2. Regarding the botrytis opinion, HAAC attacks it as wholly unreliable because his underlying knowledge only comes from pictures of onions provided by the Blands. Doc. # 31 at 4. Torrance admits he knows nothing of the sampling procedures used by the Blands in taking these pictures (*i.e.*, what containers did the onions come from, how many containers were sampled) and thus cannot attest to the prevalence of botrytis.[9] Doc. # 31-5 at 5.

---

[8] "Botrytis neck rot, caused by *Botrytis allii*, is a destructive post-harvest [onion] disease." Karen Delahaut & Walt Stevenson, *Onion disorders: Botrytis leaf blight, leaf fleck, and neck rot*, University of Wisconsin-Extension, Cooperative Extension, available at http://learningstore.uwex.edu/pdf/A3803.pdf (site as of 8/25/08). "Botrytis neck rot first becomes obvious after harvest when onions are topped and have been stored for a few days. Scales soften around the neck with infected

tissue taking on a brownish, sunken, water-soaked appearance." *Id.*

[9] HAAC repeatedly refers to the lack of a "sampling methodology" used by the Blands in taking photographs of the onions. In effect, HAAC is comparing the reliability of the Blands' photos against the reliability of USDA inspection certificates. USDA inspectors, in theory, are unbiased and have a developed "sampling

Additionally, he did not review USDA inspection records (which look for rot) of the containers of HAAC onions delivered to the Blands. *Id.* at 6. Because Torrance's opinions are based on insufficient facts/data and the Blands' unexplained sampling methodology, HAAC insists they are inadmissible under F.R.Ev. 702. Doc. # 31 at 4.

HAAC is correct: Torrance's statement that "botrytis neck rot was a major problem" is not reliable. As he admits, he does not know the extent of the rot presence in the shipment of onions, nor the sampling methods employed. Thus he may not opine on the prevalence of rot in the total shipment. However, he may testify to the presence of botrytis neck rot in the photos that he saw.[10] HAAC will then have the opportunity to cross-examine Torrance and expose the limits of his testimony.

With respect to HAAC's failure to use "proper chemicals," Torrance is not an expert in Chilean agricultural practices and admits he does not know what chemicals may legally be applied in Chile. Doc. # 31-5 at 6. But it is highly possible that similar pesticides are used on sweet onions in general, regardless of geographic area. And it is very possible that the same pesticides are legal in both the United States and Chile. So the Court will not strike this expert opinion, but the Blands must lay a proper foundation at trial showing a link between Torrance's sweet onion

pesticide knowledge and its specific applicability to Chilean sweet onion farming.[11]

To sum up, Torrance may testify as an expert but his testimony will be limited essentially to: (1) the presence of botrytis neck rot only in the photos he observed; and (2) sweet onion pesticides if a proper foundation is laid.

### b. ALFREDO CORNEJO DELGADO

Alfredo Cornejo Delgado (Cornejo) is an expert in South American sweet onion production. Doc. # 31-4 (Cornejo Depo.). He has ten years of experience in onion production in both Chile and Peru, including seven years with Del Monte Foods, a corporation that grows and distributes fresh and canned produce. *Id.* at 13, 15. Again, HAAC does not challenge his general qualifications as an expert, but rather the information upon which he bases his opinions. Doc. # 31.

Cornejo's opinions are:

- The average cost in 2004 of growing sweet onions in Chile was $6,000 to $7,000 per hectare (includes growing, harvesting, and packing). The contract allowed for $10,800 per hectare, and HAAC claimed actual costs of $9,871.18 per hectare, both of which are excessive.

- Good agricultural practices are crucial to the success of growing sweet onions in Chile. After reviewing photos, emails and documented expenses provided by HAAC, good agricultural practices were not observed (including proper pesticide application and

---

methodology" so that the ultimate grade given to produce is fairly representative of the entire container of goods inspected. In contrast, the Blands cite no articulated sampling methodology, so potentially their photos are of a very small sample of onions and thus not representative of the whole shipment.

[10] HAAC does not challenge the reliability of his conclusion that the onions in the pictures contain botrytis neck rot. *See* doc. # 31.

[11] Of course, this foundation must come from someone other than Torrance, since he is not a Chilean farming or pesticide expert.

phytosanitary[12] controls). If proper practices had been observed, the quantity and quality of onions shipped would have been greater.

- Pictures from HAAC dated 10/27/04 showed the onions in a slower vegetative stage with less foliage per plant, meaning they were in the bulbing stage. Thus, they should have been harvested within 2 weeks. Yet, they were harvested on 11/30/04, which caused quality and yield problems. The harvest delay and region's high humidity caused the onions to "cure" improperly, thus giving them a "stained appearance" and diminished quality.

- Other 10/04 photos from HAAC show the presence of disease.

Doc. # 31-2 at 2-3 (paraphrased).

To any Cornejo opinions regarding onion quality upon receipt, HAAC objects for the same reasons discussed above with respect to Torrance -- that Cornejo lacks sufficient knowledge regarding the representative nature of the Blands' photos and thus cannot testify on the prevalence of disease or rot in the entire shipment. Doc. # 31 at 6-7. Just as above, Cornejo thus may not testify to the presence of disease in the entire shipment. But he may testify about what he saw in the photographs.

---

[12] "[S]anitary and phytosanitary measures are mandatory technical requirements adopted by nations to protect the health and lives of humans, animals, and plants from risks associated with disease, pests, and contamination of foodstuffs, and to prevent damage caused by the establishment or spread of pests." Victoria Waite & Digby Gascoine, *Trade Capacity Building and Sanitary and Phytosanitary Control: A Resource Guide* at 2, Nathan Associates Inc., available at http://www.nathaninc.com/NATHAN/files/ccPageConte ntdocfilename353691526888SPS_(onscreen).pdf (site as of 8/25/08).

Cornejo's statements about HAAC's agricultural practices draws a similar challenge to those regarding onion quality. He lacks sufficient knowledge, HAAC emphasizes, of the representative nature of the photographs he viewed for the whole crop. Doc. # 31 at 8. Plus, he has never actually visited HAAC's farms and cannot testify to the weather conditions that the farm faced in 2004. *Id.*

To repeat, Cornejo may only testify as to what he sees in the photographs if he does not know how representative the photographs are of the entire crop. However HAAC fails to explain why his failure to know about the weather in the area for 2004 makes his testimony unreliable. And while Cornejo has not visited HAAC's farms, the Court fails to see the significance of that fact. Visiting the farm after the fact would not tell him what the crop looked like in 2004. But the photographs Cornejo reviewed (in this situation taken by HAAC, not Bland) do depict the farm in 2004, and HAAC does not sufficiently challenge his ability to opine about its farming practices from the reviewed photos.

In other words, Cornejo, a qualified expert, offers a reasoned opinion, based on the photographs, regarding the vegetative state of the onions and when they should have been harvested. Doc. # 31-2 at 3. Simply exposing two pieces of information that were not considered, without relating their necessity to such an opinion, is not sufficient to call his reliability into question.

HAAC also objects to Cornejo's general opinion that its claimed expenses are excessive. *Id.* at 7-8. Cornejo could not testify to any specific HAAC expense that was excessive. *Id.* Therefore, his excessive-expenses-testimony, HAAC insists, is inadmissible under *Daubert*. *Id.* The Court disagrees.

Cornejo offers an average cost of growing sweet onions based on his farming experience in Chile and Peru. Doc. # 31-2 at 2. Based on that average, he believes HAAC's claimed expenses are too high. *Id.* Nothing in *Daubert* prevents such testimony, so long as Cornejo has a sound basis for arriving at his sweet onion expense-averages. But HAAC has not challenged his method for arriving at those average costs so the Court will not exclude this expert at this time. At trial, however, Cornejo may not simply rest on his experience and provide a mere general statement of average cost. He must first lay a proper foundation for his conclusion, one that shows his specific calculations. If he cannot do this, his testimony on this subject will be inadmissible.

Accordingly, Cornejo's testimony is admissible (for now) within the limitations discussed above.

### c. RELEVANCE OF BOTH EXPERTS' TESTIMONY

HAAC's relevance contention hinges on the applicable law in this case. HAAC argues that decisions of the Secretary of Agriculture (who implements the PACA) and PACA regulations, 7 C.F.R. §§ 46.1 *et seq.*, control the issues presented here. Doc. # 31 at 9-11. If that is so, the Blands' experts' opinions on quality are not relevant, HAAC insists, based on the following: the Blands accepted the sweet onions; upon acceptance, the receiver of goods is liable for the full contract price minus damages from a breach of warranty (which the receiver must prove), *Mowen v. Cooper*, 39 Agric.Dec. 1549, 1552 (1980); but damages can only be proven by a timely federal inspection, which did not occur in this case. *See Borton & Sons, Inc. v. Firman Pinkerton Co., Inc.*, 51 Agric.Dec. 905 (1992) (inspection four days after arrival too remote in

time to show condition on arrival); *see also Tyre Farm, Inc. v. Dandrea Produce, Inc.*, 45 Agric.Dec. 796, 799 (1986) (affidavits from private parties as to condition of produce not sufficient to overcome "the requirement that damages after acceptance of goods be shown by a *cognizable federal inspection*") (emphasis added).

In other words, timely federal inspection reports are the only relevant evidence in determining the quality of the sweet onion shipment at issue here. Because both Torrance and Cornejo are private parties and not federal inspectors, HAAC further argues, their testimony on the sweet onions' condition is irrelevant under PACA evidentiary requirements because: (1) their "photograph inspections" occurred months after the Blands' acceptance of the produce, thus they were untimely; and (2) their inspections are not the equivalent of federal inspections. Doc. # 31 at 10-11.

The Blands unsurprisingly take a different view, pointing out that this case is before a federal district court so the Federal Rules of Civil Procedure/Rules of Evidence apply, and not the administrative decisions of the Secretary of Agriculture. Doc. # 43 at 2. They also argue that this is not simply a PACA case. It involves state law breach of contract issues. *Id.* Accordingly, they should not be limited in their presentation of evidence on state law claims by PACA decisions and regulations.[13] *Id.*

---

[13] The Court must point out that the Blands' F.R.Ev. 601 General Rule of Competency argument in their brief is misplaced. Doc. # 43 at 2-3. F.R.Ev. 601 states:

> Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to

What makes this case difficult is the contract in question. It provides: (1) it "will work under the rules of the P.A.C.A. ... with regards to established trading practices"; and (2) it "shall be construed in accordance with the substantive law of the state of Georgia USA." Doc. # 1 at 8. Discussing quality, it states: "All Shipments will be pre-cleared by the [USDA] prior to shipping in Chile. **BLAND'S** quality criteria must ... still be met." *Id.* at 7.

Thus the contract is fairly ambiguous about the interplay between state and federal law as it applies to the contract claim, and the parties fail to argue this point (one side claims that only federal law applies, the other only state law). Furthermore, "Bland's quality criteria" is never defined in the contract, and neither party sheds light on its meaning in their briefs.

But the Court can surmise this much: Bland's quality criteria must be in addition to PACA requirements/USDA inspection grades. Otherwise, including the requirement of meeting "Bland's quality criteria" would be superfluous since the contract already states it will work under the rules of the PACA. And under Georgia's law of contract construction (which the contract calls for), "[i]t is axiomatic that any construction that renders portions of the contract language meaningless should be avoided."

---

which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.

*Id.* Because this is a civil action that involves state law claims, the Blands cite Georgia statutes regarding the competency of witnesses. But Rule 601 is not at issue because this challenge does not involve the general competency of witnesses. Rather, as discussed *supra*, it deals with expert witnesses whose admission is determined by Rule 702.

*Atlanta Development, Inc. v. Emerald Capital Investments, LLC*, 258 Ga.App. 472, 478 (Ga.App. 2002).

Additionally, the PACA merely provides a remedy in addition to state law; it does not preempt it. *See United Potato Co., Inc. v. Burghard & Sons, Inc.*, 18 F.Supp.2d 894, 899 (N.D.Ill. 1998) ("PACA was meant to add a remedy beyond those already provided by the states and other statutes"); *see also Fletcher v. Ozark Packing Co.*, 188 F.2d 858, 860 (8th Cir. 1951) ("The [PACA] was not intended to repeal the law of sales or to destroy the rights and liabilities of parties contracting under that Act"). So "state law continues to govern the relationship between sellers and buyers to the extent that the PACA does not address an issue in dispute...." Andrew M. Campbell, Annotation, *Reparation Proceedings Under Perishable Agricultural Commodities Act (7 U.S.C.A. §§ 499a et seq.)*, 126 A.L.R.Fed. 487 (1995).

The PACA does not address the additional quality criteria agreed upon by the parties in their contract; thus, state law applies. Consequently, PACA decisions and regulations do not control the proof of whether that criteria was met. Accordingly, the Blands' experts' testimony is relevant and admissible to proving whether or not their quality criteria was met under a state law breach of contract claim.

## D. Partial Motion for Summary Judgment

The Blands filed a breach of contract counterclaim against HAAC, alleging the following: (1) the onion quantity shipped was "greatly smaller" than the contractually-contemplated amount; (2) the quality of the produce shipped was very poor; (3) HAAC

failed to pay certain freight costs required by the agreement; and (4) HAAC failed to document and verify claimed expenses. Doc. # 7.

Again, HAAC moves for summary judgment on the Blands' breach of contract counterclaims. Doc. # 33. It contends that: (1) the Blands lack proper evidence of sweet onion quality, so they cannot prove their claim; (2) the Blands have no evidence of damages; (3) the contract not only allows HAAC to claim higher expenses than it did, but it does not require HAAC to account for its expenses. *Id.*

Under F.R.Civ.P. 56(c), "[t]he district court should only grant summary judgment ... where the record evidence, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003); *see also* Fed.R.Civ.P. 56(c). "In ruling on a Rule 56 motion, the district court may not weigh the evidence or find facts. Instead, the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party." *Morrison*, 323 F.3d at 924. In light of those standards, the Court will turn to particular claims.

### 1. *Sweet Onion Quality*

HAAC'S argument here mirrors that discussed in Part III(C)(2)(c) *supra* -- that the PACA controls this issue and thus federal inspection certificates are the *only* proper proof of onion quality. However, state law covers whether or not "Bland's quality criteria" was met under the contract. *See supra* Part III(C)(2)(c).

In support of the Blands' contentions that the onions did not meet minimum quality standards, they offer two expert witnesses testifying about the onions' poor condition. Furthermore, the Blands offer the affidavit of its production manager at that time, Luis Indacochea. Doc. # 44 at 5. She oversaw the Blands' warehouse and the produce it received when HAAC sent the disputed shipment. Doc. # 44-2 at 1. She states:

> [T]here were obvious problems with the condition of the onions that impacted their marketability, including their poor appearance involving sour skin, considerable staining and splits at the root level. Forced air drying and subsequent new packing was done to enable salvage and marketing of some of the onions while others had to be discarded.

*Id.* at 2. The Blands also produce an email that Indacochea sent to Delbert Bland and other superiors on 1/10/05 (around the time of receipt) conveying the same message as above and attaching photographs she took of the produce on that day. *Id.* at 3.

In contrast, HAAC points to 19 USDA inspection certificates for the sweet onion shipment, 18 of which indicate a U.S. No. 1 grade. Doc. # 33 at 6. This means that the sweet onions were in good condition by USDA standards.

Because each party has opposing evidence regarding the condition and quality of the sweet onions upon delivery, there is a disputed issue of material fact regarding whether HAAC satisfied "Bland's quality criteria" as required by the contract. HAAC's summary judgment motion therefore must be denied on this claim.

### 2. *Lack of Damages Evidence*

HAAC alleges there is no evidence the Blands incurred damages as a result of any breach of the contract. Doc. # 33 at 7. So summary judgment should be granted in favor of HAAC and against the Blands on that claim. *Id.*

However, this argument fails. "[S]ummary judgment on [a] contract claim for the failure to prove damages is not appropriate." *Poe v. Sears, Roebuck & Co., Inc.*, 1 F.Supp.2d 1472, 1477 (N.D.Ga. 1998); *see also Dering v. Service Experts Alliance LLC*, 2007 WL 4299968 at * 10 (N.D.Ga. 12/6/07) (unpublished) (same). Georgia law, it must be remembered, allows for the recovery of nominal damages in the event of a breach of contract. *See* O.C.G.A. § 13-6-6 ("In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action"). Therefore, summary judgment is denied.

### 3. *Accounting for Expenses*

The parties' agreement requires the Blands to reimburse HAAC for its growing costs associated with the onions shipped. Doc. # 1 at 7. It also states, "*HAAC CHILE, S.A.* will keep records for all costs associated with growing." The Blands contend that HAAC "has violated this provision by providing co-mingled records without identifying which costs actually relate to the fields and products which were a part of the joint venture and by representing that all such co-mingled expenses were related to the joint venture." Doc. # 44 at 2. In other words, the Blands allege they are being charged for expenses that are not related to the joint venture. *Id.* For this reason, they seek an accounting of the expenses incurred by the parties. Doc. # 7 at

4.

HAAC responds by moving for summary judgment on this counter-claim, contending that the contract requires the Blands to pay HAAC $291,600 for growing expenses. Doc. # 33 at 8. Since HAAC only claims $266,522, an amount less than allowed under the agreement, there can be no breach. *Id.* The pertinent provision of the contract is as follows:

> 7) *BLAND* agrees to pay *HAAC CHILE, S.A.* the estimated sum of $5.00 US to cover the cost of growing, packing, etc. for each 40 Pound Package of onions upon receipt by *BLAND* of a loading manifest evidencing the shipment FOB Chile. Assuming 27 total Hectares will be shipped; $145,800.00 US (27 Hectares times 2 (2 loads per hectare) times 1080 packs equals 58,320 times $5.00 US equals $291,600.00 US divided by 2 equals $145,800.00 US)....

Doc. # 1 at 7.

HAAC contends that this contract provision is clear and requires the Blands to pay $5.00 per 40 lb. package shipped for growing expenses.[14] Doc. # 33 at 8. The triggering event for payment of growing expenses was receipt of a shipping manifest, not an accounting. *Id.* In fact, the contract, HAAC emphasizes, never mentions an HAAC accounting requirement at all. *Id.* Accordingly, the plain language of the

---

[14] Neither party addresses the fact that the calculation above contemplates that the parties committed to split the growing costs. In that regard, a later calculation to determine gross profits for the final liquidation payment between the parties expresses the same intent: "Less cost for Growing (Cost split between [HAAC] and BLAND ...). Doc. # 1 at 8. Because the parties do not discuss this issue, the Court abstains as well.

14

contract should control -- thus, the Blands'
counterclaim for an accounting should be
dismissed because the agreement does not
require one. *Id.* at 9.

The Blands weakly respond that the contract
requires HAAC to maintain records of all
growing costs. Doc. # 44 at 3. Additionally, the
agreement requires a final liquidation payment
that splits the gross profits 50/50 between the
parties. *Id.*; *see also* doc. # 1 at 8. In
determining the gross profit, the parties subtract
growing expenses (among others) from the total
invoice of the sale. Doc. # 1 at 8. Therefore the
Blands argue, the records requirement coupled
with the liquidation payment (that accounts for
growing expenses) "clearly contemplate[s] an
accounting between the parties of the expenses
they incurred relative to their joint venture."
Doc. # 44 at 3.

However, the agreement does not *clearly*
contemplate an accounting of HAAC's growing
expenses at all because it never discusses the
matter. Doc. # 1 at 6-8. For that matter, an
accounting would seem unnecessary in this
situation, since the contract *expressly* requires
the Blands to pay an agreed upon amount for
growing expenses per package of onions
shipped. In that light, inferring an accounting
requirement would conflict with the clear
expense-payment-requirement and thus create an
ambiguity. Meanwhile, "[c]onstruction of a
contract is initially a matter of law for the court,
and if the language is clear and unambiguous,
the court simply enforces the contract according
to its clear terms." *Alday v. Decatur Consol.
Water Services, Inc.*, 289 Ga.App. 902, 904
(2008). Because the growing expense language
of the agreement is unambiguous, the Court will
not read non-existent requirements into the
contract just to create an ambiguity.

This much, then, is clear: The contract itself
does not require an accounting of HAAC's
growing expenses before payment. Thus,
HAAC's motion for summary judgment is
granted on this limited issue.

However, there are other issues that must still
be resolved with respect to this counterclaim
before summary judgment can be completely
granted or denied. Under F.R.Civ.P. 56(d), the
Court directs further briefing on the following
issues:

● While the agreement itself does not require
   an accounting for growing expenses, the
   Blands argue that an equitable accounting
   should occur under O.C.G.A. § 23-2-70.[15]
   Doc. # 44 at 7. This contention was
   specifically raised for the first time in the
   Blands' reply to HAAC's motion for
   summary judgment. HAAC has not filed any
   response to these arguments. Thus the
   parties shall fully brief this issue before the
   Court will consider it.

● HAAC claims growing expenses of $266,522
   and simply states that number is less than the

_____

[15] That statute provides:

   Equity jurisdiction over matters of
   account shall extend to: (1) Mutual
   accounts growing out of privity of
   contract; (2) Cases where accounts are
   complicated and intricate; (3) Cases
   where a discovery or writ of *ne exeat* is
   prayed and granted; (4) Cases where
   the account is a trust fund; (5)
   Accounts between partners or tenants
   in common; and (6) Cases where a
   multiplicity of actions would render a
   trial difficult, expensive, and
   unsatisfactory at law.

O.C.G.A. § 23-2-70.

15

$291,600 the contract allows. But the measuring stick for claimed growing costs is $5.00 per 40 lb. package shipped. The Court lacks any information regarding the number of packages delivered to substantiate those expenses (and there are claims that HAAC delivered fewer onions than the parties contemplated).

● In a similar vein, in two places the contract expresses an intent that the parties will split the growing expenses, *see* doc. # 1 at 7 ¶ 7 and 8 ¶ 9, something neither party discusses. Yet, HAAC's briefs indicate, though not clearly, that it contends the Blands owe it the whole $266,522. Clarifying arguments are required before the Court can decide the motion for partial summary judgment.

Accordingly, HAAC shall file a comprehensive brief on these issues within 30 days of the date this Order is served. The Blands will then have 20 days to respond. The parties may then file as many reply briefs as they want -- though the Court is free to issue its order at any time after the initial briefs are filed. *See Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 609 (S.D.Ga. 2003); *see also* S.D.Ga.Loc.R. 7.6 (authorizing reply briefs but imposing notice requirements and time limits).

## IV. **CONCLUSION**

In sum, the motion of defendants Delbert Bland and Bland Farms, LLC to dismiss for lack of subject matter jurisdiction is *DENIED*. Doc. # 26. Their motion to exclude plaintiff HAAC's expert witness is *GRANTED* and *DENIED* in part. Doc. # 27.

The motion of HAAC Chile, S.A. (HAAC) to exclude the Blands' expert witnesses is also *GRANTED* and *DENIED* in part. Doc. # 31. Its motion for partial summary judgment (doc. # 33) is *GRANTED* and *DENIED* in part, and the

parties shall file further briefs as discussed *supra*. On a ministerial note, HAAC's consent motion to file a sur-reply brief (doc. # 42) is *DENIED* as moot because "parties may file as many reply briefs as they want." *Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 609 (S.D.Ga. 2003); *see also* S.D.Ga.Loc.R. 7.6. HAAC's motion for extension of time (doc. # 32) is also *DENIED* as moot.

Finally, this Court's Scheduling Order (doc. # 22) indicates that discovery ended on 1/31/08 and the deadline for filing pre-trial motions has passed. However, within the same initial 30 day window for further briefing provided *supra*, either party may raise any additional necessary motions that might reduce the issues for trial.

This ___26___ day of August, 2008.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA